The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning everybody, please be seated. I want to welcome everybody to the United States Court of Appeals for the Fourth Circuit. There are two cases on for argument this morning. Before we get to that though, I want to extend a hearty welcome to the newest member of our court, Judge Nicole Berner, who was confirmed by the Senate late yesterday afternoon. Received her appointment by the President that evening. Drove down to Richmond either last night or this morning, where I saw her in about an hour ago. We've lined up two really easy cases for her this morning. Welcome, Judge. Thank you. Our first case is 21-1255, Bianchi v. Brown. Mr. Patterson. Thank you, Your Honors, and may it please the Court, Pete Patterson for the appellant. Under Heller and Bruin, this should be a straightforward case. Those cases hold that the government can only ban firearms that are dangerous and unusual. And here, Maryland bans the most popular rifles in the nation. That law cannot possibly be squared with Heller and Bruin, and is therefore unconstitutional. Under Heller and Bruin, of course, we start with... The plaintiffs in this case are part of the people for Second Amendment purposes. Yes, the people, the plaintiffs in this case, the individual plaintiffs in the organization, the members who they represent are law-abiding citizens of the nation. Those are the allegations of the complaint in any event. And so they're clearly part of the people whom the Second Amendment protects. And so the issue in this case is firearms in the Second Amendment. And for purposes of the plain text, in Heller, the Supreme Court defined arms. It means the same thing at the founding as it meant today. And it includes all weapons of offense. And it also includes... Is it so clear that they have to be law-abiding citizens to be the people? Well, no, as a matter of plain text, the people is everybody. Is it in the text that they have to be law-abiding citizens? No, that is not in the plain text. The Supreme Court said that. The Supreme Court did not say that. And we said it. What? Excuse me? And we said it. Not to my knowledge, Your Honor, that you have said that. But what the Supreme Court said is that all Americans are part of the people, and then there are questions of what the historical regulations would be. Again, at issue here in this... So if you're not a lawful, a law-abiding, responsible citizen, which I think is the language for decisions, where does that come into... Where does that factor into the Second Amendment analysis? That factors into the historical analysis of the historical limitations on the right. So at the level of plain text as range held in the Third Circuit, the Supreme Court said in Heller that the Second Amendment extends to all Americans. The same thing that the people means in the Second Amendment is what it means in the First Amendment. I thought they said in Heller is the right of law-abiding, responsible citizens to use arms in defense of hearth and home. That's the language. Well, there is language of law-abiding, responsible citizens. It does say law-abiding. You said it didn't. It says law-abiding, responsible citizens. Yes. Heller says that, and Bruin says that as well. But the reason you can tell that... And Bruin didn't change Heller. Not at all. The reason you can tell that at the historical level is that... Wait, you agree with what Judge King just said, that Bruin didn't change Heller, correct? I agree that Bruin didn't change Heller. All right. Correct. Yes. And so at page... But just as Bruin didn't change Heller, what it did is clarify that many courts had misinterpreted Heller in several ways. of scrutiny analysis, which Bruin made clear was not correct. And another way was with respect to what arms are protected, when Bruin repeatedly said that Americans have a right... And if Bruin didn't change Heller and our Colby decision, our primary holding, was based on Heller, then nothing about our primary holding in Colby has been altered. That is incorrect, Your Honor. How is that incorrect? The alternative holding in Colby was to apply intermediate... So this is the point... If that's the alternative holding, do you agree that the primary holding was not addressed at all in Bruin? I do not agree with that. Show me where in Bruin Colby's primary holding was mentioned. At pages 21, pages 32, and pages 47 of Bruin, it said Americans have a right to possess arms that are in common use. And did it mention Colby? It didn't mention Colby, but that undermined the reasoning of Colby. Did it mention M-16s and the like? Those are quotation marks from Heller. Did it mention those? It didn't mention M-16s and the like, but what it clarified was the test. Just as with respect to intermediate scrutiny, it said that every court that had applied intermediate scrutiny had gotten it wrong. We're not changing Heller. We're applying the standard we applied in Heller. And just as it clarified the standard of review, it also clarified that tests were protected arms. But in Colby, that was the alternative holding. I mean, I agree with you that the test in the alternative holding was changed in Bruin, but that was not our primary holding. Well, no, the test was not changed in Bruin. Bruin said that Heller demanded a test rooted in history and tradition. So nothing from Heller changed with respect to the standard of review. So unless you were prepared to say... That's what I'm getting at. The primary holding was not... And I'm saying the primary holding was undermined just as much as the alternative holding. Because the court made clear in Bruin that the Second Amendment protects the right to possess arms that are in common use. And in Colby footnote 10, explicitly refused to engage in a common use analysis, the very analysis that Bruin said establishes constitutional protection. Now, you're seeking to enjoin this enforcement of this statute in its entirety, aren't you? With respect to semi-automatic rifles, yes. Well, okay. But the statute has a great many weapons that are listed there, quite a large number. Yes. And I was struck by the fact that what you're seeking here are all the sweeping injunctive relief against the statute in its entirety. And the implication would be that none of those weapons that are listed in the assault weapons ban can be regulated by the state. Every one of them is beyond the scope of any kind of public regulation. And so it's quite dramatic, really, when you're saying here, you know, 25, 30 weapons, some of which appear to be quite dangerous, others maybe less so. But you're saying they're all off the table. The state can't do anything about any one of them. And it seems to me that this resembles a facial attack and that you're not willing to wait for an as-applied challenge to a particular weapon or whatever. You're just going to go for the whole thing. And what I'm asking is why shouldn't facial attacks under the Second Amendment be disfavored just as facial attacks under the First Amendment are disfavored? We don't like facial attacks that seek to void statutes in their entirety. And yet it seems to me that's what you're lodging here, something that's quite sweeping and quite dramatic and sweeps a whole lot of different weapons off the table and say that they're beyond the state's power to regulate. Why should we go at it in this dramatic fashion at the outset? First of all, we're not saying it's beyond the state's power to regulate. We're saying it's beyond the state's power to ban. And second of all, it would be no different that these are all firearms of the same basic type, semiautomatic rifles. It would be no different than in Heller if instead of D.C. saying no handguns had listed out every model of handgun and said, you know, you can't possess any handguns. And here's how we define handguns. Here's every model of handgun that is available. And so in a facial attack, it may be disfavored, but the point is you apply the constitutional test. And here Bruin has set forward the constitutional test. And when you apply that test to semiautomatic rifles, it cannot be sustained. But if in the alternative, if, you know, we focus primarily on AR-15 type of rifles and AK-47 type of rifles, if the court wanted to limit relief to those two, you know, we wouldn't be talking about that. Tests, though, may, even though the means in scrutiny that we formally use is no longer, and there's much more of an emphasis upon historical precedent. But if that's the case, then why aren't you drawn back into the challenge that my friend Judge King relayed earlier, and that is historically the state has been able to regulate in some way firearms with a high lethal potential. Well, Your Honor, what... That's the history of it. Heller said the history was dangerous and unusual. And if you actually look at the historical regulation of firearms to the extent any have been banned, the issue has been that there's... Heller talked about M-16s and the like, weapons of war. Well, what Heller said... Sorry, Your Honor. Well, what Heller said... I'm sorry to keep interrupting. I apologize. But what Heller said was those weapons could be banned not because they're useful in military service, but despite their utility in military service. The dispute in Heller was between, are the covered firearms, is it limited to weapons that are useful in warfare, which was one position. The other position was, is it firearms that are in common use regardless of if they're useful in warfare, which is the other position. Nobody argued that firearms... These are dramatically different weapons that are before us in this case than the handgun statutes and handgun regulations that were at issue in Bruin and Heller. This is a whole jump up. It's a different order of magnitude, is it not? It is not, Your Honor. These are relatively underpowered rifles. But what's interesting...  Yes. An AR-15 can fire 300 rounds a minute. Well, the Army says 45 to 60 rounds a minute. But in terms of underpowered, in terms of the power of the... I mean, there are handguns, and they're used in the military, too. Correct, Your Honor. The pilots of our fighter planes have a handgun with them. Yes. But we're talking about M-16s and the like. And the AR-15 is the M-16. It is not. It is the M-16. It is not in a constitutionally dispositive sense. What the Supreme Court said in Heller is that... They named the M-16. Justice Scalia said the M-16 and the like. And the like. And the like was firearms that are highly unusual in society at large. And these firearms are the opposite of highly unusual in society at large. And the reason is what in Staples, the Supreme Court 30 years ago said that the line between what has traditionally been a lawful possession and what is not is semi-automatic versus automatic fire. And the reason... Mr. Patterson, I'm sorry. I'm over here, right in the middle. Okay. So, you just got to a point that I wanted to ask you about. So, under your theory, if Congress had never gotten around to banning fully automatic rifles or machine guns and they had become popular in common use to the extent that apparently AR-15s are, the state couldn't regulate that kind of a weapon? Well, again, we're not talking about regulation. There could possibly be some types of regulation. Or banning. But they cannot ban firearms that are in common use. Correct. So, a state could not ban a machine gun assuming that there had been no federal ban. If they had been in common use, but they had not. I mean, we had a... What about a bazooka that's used for recreational purposes? Any firearm that is in common use for lawful purposes... A tactical nuclear weapon. Well, a tactical nuclear weapon is, I mean, it's a... So, there's no limit. Essentially, once the cat is out of the bag, the Second Amendment trumps all. That's your position. That's not my position. That is Heller's position and Bruin's position, which says that arms that are in common use are protected, period. And you can see that... Let me make sure I understand what you're asking. Is it your position that the ban on machine guns is now unconstitutional under your populist theory? No. Why is it not? Because machine guns are not in common use. Under the Hollis versus Lynch in the Fifth Circuit, it has the number that are potentially... Can the action cause the action? If they're not in common use, does that not flow from the fact that they are banned? Well, that's one element. There was a charge... And if it's merely the popularity of it, just having a lot of them would make it constitutional under your theories. It's not merely the popularity. Popularity is sufficient, but not necessary for constitutional protection. That's because it's a state burden. They have to show they're both dangerous and unusual. Can I ask you a question? I'm just trying to imagine that I'm like legislative counsel to a state. What day does... So say they pass a ban on machine guns. Yes. Okay. And then Congress lifts its ban, and so now machine guns are in more popular currency. Is there like a day I could give my client as to when a formerly constitutional law becomes unconstitutional? You have to look at the use of that firearm to see what they've become... I feel like my client's going to say I need more than that. Like I have an obligation as a state legislature not to have unconstitutional laws. I think any time... Tell me what day I have to repeal the law. I can't tell you the specific date, but any time there's more than... No, there are 176,000 civilian machine guns. That's Hollis versus Lynch. That's after 1986. They have been banned for civilian possession, and that's how many are in civilian hands. Tell my client 176,000 were good. I don't know about 177. Well, I would say any time you get above a million, that starts to be in common use. And, for example, Heller 2, the D.C. Circuit, at that time... There's a million. What percentage of Americans is that? That's not a large percent of Americans. It may not. But it is something that is in common use. It's still in common use with the D.C. Circuit and Heller. How can one percent be common use? Well, it's actually the state's burden to show that they're dangerous and unusual. And what Heller said is highly unusual in society at large. Can I give you a typo? I think that can't possibly be right, that it has to be both dangerous and unusual. Sure. Okay. So imagine that someone invents a new type of technology that makes handguns dramatically more useful in some way, right? Some massive improvement in the characteristics of handguns. And so this becomes extremely popular extremely quickly. Every single manufacturer starts manufacturing handguns with this feature. Millions of these handguns are sold. And then it turns out three years later, handguns manufactured with this feature have an unfortunate tendency. After a few years, the part degrades. It blows up in the face of the person who fires the weapon after a couple years. Are you seriously telling me that the states could not, in response to that new information, ban that type of handgun? It's perfectly safe to the user when you sell it, but after a couple years, the part degrades. And it's now going to blow up in like a non-trivial number of situations in the face of the user. Could the state ban that type of handgun? Well, especially because the analysis is today. And presumably people that have these, once they learn they're going to blow up in their face, are not going to be using those handguns. I'm not going to rely on a product recall. I'm going to ban them. I'm going to order a mandatory recall and make possession of them illegal. Well, the test that Heller says is everything that is in common use is protected. So, if people persisted in using those for lawful purposes, despite that, despite them blowing up in the face. It doesn't say that M-16s and the like are protected. It says they aren't. It says they aren't because they're highly unusual in society at large. You need to redirect that. No, because they're highly unusual in society at large. That is why they are unprotected. Again, the dispute, the Second Amendment was put in the Constitution, as Heller said, to preserve the militia, which was valued for things like putting down insurrections and repelling invasions. So, the notion that a firearm could not be protected because of its military utility, Heller said, we look at the preparatory clause to do kind of a sanity check on how we're interpreting the operative clause. And the notion that a firearm could be banned because of its military utility would make no sense in terms of the reason why the Second Amendment was put into the Constitution. There are firearms that are more useful, most useful with the military. Most useful with the military. Machine guns, nuclear weapons, M-16s, and the like of M-16s. Yes. And so, what Heller was making a defensive point. What's the M-16? It's the infantryman. Correct. And Heller was making a defensive point because the charge was if you can't have M-16s. Have you ever fired an M-16? Excuse me, Your Honor? Have you ever fired an M-16? I have not, Your Honor. Well, I have. We used them when I was in the Army Reserve. And that was way back. Way, way back. Yes. And we took shots at the targets. Wherever we hit, there was nothing left. The kick was so powerful that when the bullet struck the human being, it splintered them into all sorts of different pieces. There was very little left of the human being. And that was a much earlier model of the M-16. Since then, it's been perfected and perfected and perfected to an even more lethal weapon than the one that I used. And if we are establishing a precedent that says no matter how dramatic the advance in technology, no matter how lethal the weapon, it's all beyond the state's capacity to regulate in some way. I mean, the Chief's question posed, where is the limiting principle to all of this? Where does it stop? If this considerable list of weapons, and I don't purport to be familiar with all of them, but I assume the Maryland legislature was, and if it's, what is, what can be regulated? Your Honor, these are not unusually dangerous firearms. If we look at the re-ballistics report that the state cited, these rifles have less than half of the power of M1 Garands, which are expressly accepted from Maryland statute that are entirely lethal. I disagree that these weapons are uniquely destructive or lethal. Were they designed for military use? The AR-15, absolutely not. No semi-automatic. The AR-15 was not designed for military use. The AR-15 as it's sold in its civilian form was not. What was it originally designed for? The firearm that was designed for the military is a select fire firearm that can fire in automatic and burst fire mode. The AR-15 cannot do that. It was designed for the civilians. It's the civilian version, what the Supreme Court said in Staples. It's the civilian version of the AR-16, which is the standard infantryman weapon that Judge Wilkinson used when he was in the Army. The AR-15 is the civilian version. I don't agree with that. Judge King, I'd like to follow up after that. The reason why machine guns didn't gain popularity and can be banned is because they fire indiscriminately. You can't fire accurately after the first round. And that's the same thing with respect to trap guns, is that they fire indiscriminately. They might kill a robber, they might kill a daughter. The AR-15 is more accurate than the M-16. Exactly. And there's no... It's a semi-automatic. You can aim it better. And the infantryman fired mostly that way because they can, they select their target. Correct. And there's no history in this country banning firearms because they're accurate. They know what they're doing. They're trained. Counsel, at the beginning of your argument, you talked about the plain text as Bruin uses that term. Is it your view that plain text is different than ordinary and normal meaning of a term? Yeah, I think ordinary and normal meaning incorporates the limitations and historical limitations. Plain text, what Bruin said, is just naked text. Like, you're looking at the dictionary. What does this word mean? So... Yeah, the ordinary normal meaning of that word, just the word alone. And so with respect to arms, what Heller and Bruin both said, when you put the textual elements of the Second Amendment together, it protects the right to possess and carry weapons in case of confrontation. And so there's nothing in the plain text that would allow you to distinguish between one type of weapon versus another type of weapon. So I'm trying to make sense of Bruin as a whole. And it talks about Heller first using history to determine the characteristic of the right and determine this an individual right. And then using history to determine the contours of the right. And then using history to determine the constitutionality of regulations. And so I'm wondering if it's not fair to read the contours of the right as part of the plain text. Sounds like you're saying that plain text is not ordinary and normal meaning. It's something more narrow? Well, it is ordinary and normal meaning. But just ordinary and normal meaning of the words in terms of you were speaking the English language at the time this was adopted. A lot of times when we look for that sort of inquiry, we don't just look at dictionaries. We look at historical references and things like that. So it seems like you're... And maybe Bruin does this. I certainly... It doesn't use ordinary and normal meaning. It uses plain text. Maybe that's what it's doing. But if so, it's drawing a distinction from how we normally look at the ordinary and normal meaning of words. Well, I think it's the ordinary and normal meaning. So I think there's a difference between the ordinary and normal meaning of the words and the original understanding of the scope of the right. Because the scope of the right would include the historical limitations. But those historical limitations do not come from the words themselves. Those come from historical practices. The limitations... Are limitations the same thing as regulations? I mean, it seems to me that's a different subject matter. What are the scope, what are the contours of the right is maybe a limit of the right, but that's different than the regulation of the right. Or do you think those are one and the same? I think those are essentially one and the same. I agree that there's a distinction. But the distinction is you look at the historic regulations to determine the limitations on the scope of the right. And you can see this is what Heller did in part three of its opinion. And that's when it looked at the dangerous and unusual test. And if you look at the plain text analysis of Bruin, it's a few short paragraphs. Let me follow up on the plain text question that Judge Quaterbaugh has posed here. The Bruin court, which is really the reason we're here, because but for that it wouldn't be here. It changed their analysis. Okay, got rid of the means of the end of the test. That's gone from code. We know that. Everybody agrees with that. So it then formulated two steps. First step being the plain text, and then it shipped the burden over to the government to deal with the historical aspect of it. Within the Bruin court, in determining what is plain text, it's set for three different inquiries that you have to make. And the first being the question of whether it's just an agent point, whether it's part of the people. Are you part of the people? Well, in Bruin, there's no question he's a law-abiding citizen. They're not. They were part of the people. Then it asked whether it was in common use. Well, that was not a question of Bruin either, because they said, okay, you don't have to ask that. This is a hand bill. We know that's the contestant weapon that is in common use. So in that case, it focused on the proposed course of conduct. But the question that at least what seems to come from Bruin is the court did that analysis first to determine that step one, does it meet it? In your instance, you said yes, it does. So therefore, you go to the historical analysis. But if you don't find it in step one, in other words, if it's not in common use, if it's not part of the people, or if it's not a proposed course of conduct, you don't get to historical analysis. Is that correct? Well, Your Honor, I'm glad you focused on that discussion on page 32 of Bruin. Because many have read it the way Your Honor is reading it. But actually, I think it favors you. What I was reading to you is what is in the text. I wasn't reading it. I wasn't interpreting it. Okay. The interpretation. What the court said is no one disputes that these people are law-abiding responsible citizens. No one disputes that these arms are in common use. So that means we don't have to evaluate those matters at all. Not as a matter of playing peck. In that case, because it was not disputed in that case. Right. In this case, the question of whether it is in common use is in dispute. I'm making a mistake. This is not a handgun. That was a handgun. This is an AR-15. The very question that's been alluded to by my colleagues here in the differentiation of the types of weapons, if you're talking about a handgun, Bruin didn't need that. Everybody in this room knows a handgun is in common use. What we don't know is whether an AR-15 is. So that's the first determination that has to be made is whether that's a weapon that's in common use. If it is, you have one way to go. If it's not, then you have a different way. But don't reach that question, the question of the step two of the historical analysis, until you do that first step as they did in Bruin. Well, AR-15 is the most popular rifle in the history of the nation. So we do know that. But anyway, I'm making an analytical point. You're escaping that. You're escaping the question. Right. We could get into what's more popular or not. You can talk about how many rounds. There's nothing in Keller, Bruin, or McDonald's that talks about number of rounds. If we get in that business, we're going to have a conversation we've been having today of whether or not you fired one in the military, how many rounds it's got, who can talk about how sophisticated a weapon is. That's not the inquiry. I mean, Bruin made it pretty simple. It's set forth, as you said, two steps, plain text. And then you do the plain text, you've got three inquiries there, two of which were not relevant in Bruin because it's a handgun. In the instance here, could you characterize the individual here as a law-abiding citizen? I mean, maybe so, I don't know. Or in common use, then you have that question as to whether the machine gun is. But that's the question we have to answer first before we get into this historical analysis. Your Honor, I see I'm over my time, but I would like to respond just as a matter of analytical in terms of Bruin. That discussion of Bruin, that was not a plain text discussion. What the Supreme Court said is we don't have to analyze arms or people at all as a matter of text or history because these people are law-abiding responsible citizens and these arms are in common use. So then we can go to the plain text of Kerry. But the court didn't come back to the history issue. The issue in this case, I'm here. The issue in this case seems to be what Bruin holds. There have been a lot of questions about policy and logic and reasonableness and speculation about technology. But it seems to me our task is to apply Bruin. And Bruin makes pretty clear that you start with the plain text to determine the prima facie right. And this is what it says about the plain text. It says the Second Amendment extends prima facie to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. That's the end of it. It actually adds something more. Thus, even though the Second Amendment's definition of arms is fixed according to the historical understanding, that general definition covers modern instruments that facilitate arms self-defense. But the text, it reads to be all instruments that are bearable arms, ones that you can carry. Correct. And then it says the common use issue is part of the historical. And it makes that explicit, too. It says we found it fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons that the Second Amendment protects the possession and use of weapons that are in common use at the time. That was the second step. Now, it seems to me our task is simple in this case if we're going to read faithfully what Bruin said. And Bruin said all bearable arms, all bearable instruments create a prima facie case. In this case, the weapons described are bearable. Nobody disputes that. It seems to me what we ought to do is basically articulate that and send it back and let Maryland come forth with the historical analysis as to whether it's in common use, whether it's dangerous and all those other things that are being disputed as almost matters of policy here. Well, I agree with everything Your Honor said except that very last point, which we think there's simply an impossible task for Maryland to show that these are dangerous and unusual weapons. I don't know. The test, ultimately Bruin says the test is what is in common use today in the present tense. Correct. And so that analysis has not been conducted. And by the district court. And it seems to me that if the weapons are in common use today, the question is going to be whether common use we get to the debate that Judge Harris raised. Is it in common use? What is common use? There's this decision just came out from the Central District of California where they found that 24.6 million AR-15s are not in common use. That was the holding the district court made as sort of an interesting calculation. But it seems to me that's to me what's at issue here. And we ought to follow Bruin whether we like it or not. I mean, there's a lot of political pressure on on a court, a third branch court. And as a consequence, we sit here and debate all kinds of arms as if we're some kind of a subcommittee. And when we're in bank, we do act like a subcommittee. Counsel, can I ask one more analytical point? I know your position is that we could do that analysis here. And there's a debate about remand or not. Regardless of whether common usage is a step one inquiry or a step two inquiry, if there's a determination that the weapons here are commonly used, when you look at Bruin's discussion of common use at step two, it seems like the determination of common usage almost is the end of the historical analysis. Correct. The state there put forth three colonial regulations. And Bruin says, first, well, three might not be enough. Then it says those regulations actually support the use of handguns. But then it seems to say even accepting that they might be analogs, if they're in common use today, that trumps that history. Am I reading Bruin right in that regard? I wouldn't say it trumps the history, but the historical tradition is that dangerous and unusual firearms can be restricted. So once something's in common use, it's outside of its historical tradition. And you're correct. That's the end of the case. And in terms of how Bruin would approach this, we know what the author of Bruin would do. Because in his Friedman dissent, he said when there were five million of these firearms, five million owners of these firearms, they were in common use. That may be right. That's kind of us reading tea leaves about one judge or not. But just analytically, that's how Bruin seems to read common usage as it applies even if you look at it. Well, because the history, what Bruin is looking for is historical principles. What is the principle that allowed regulation? And what Heller held is that the principle that allows regulation of firearms is that they're dangerous and unusual. And so if they're in common use, they, by definition, do not fit within that history. That's the other side of that coin. That's the other side of that coin. What Heller said is firearms that are not typically possessed by law-abiding citizens for lawful purposes is the flip side of in common use. Mr. Patterson, can I ask about that? You focused, I think, almost exclusively on common use in the context of confrontation and self-defense. Is it your position that if a particular weapon is not amenable to use for self-defense but might be amenable to use for recreational or other purposes, that that weapon could be regulated? Absolutely. It's any lawful purpose. Not that it could be regulated, that it would be protected. It's whether it is possessed. What Heller said is the state needs to show that it's not typically possessed by law-abiding citizens for lawful purposes. Self-defense is, of course, a paramount lawful purpose. But there are many other lawful purposes. And what the record shows here, all the user surveys have been done. So the Seventh Circuit's decision where they focused primarily, if not exclusively, on self-defense as the purpose, the sort of paramount purpose, if not sole purpose, is just wrong. Correct. That is incorrect because Heller said lawful purposes. Let me ask a clarifying question, at least from my understanding, just to be sure we're on the same page on the first step of the claim in the text that Judge Nima alluded to. And I believe it started out with the question of the person inquiring from the language, it could be any weapon. Well, that cannot be true unless they abrogated the whole thing about Heller. Because Heller did put a limitation on it. It said that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes. Yes, those weapons are protected. So there is a limitation. There's not any weapon. Well, yes, any weapon at the plain text. Those weapons are within the plain text. They're presumptively protected. But my point being is there is a limitation. It's not any weapon. It is, it does not protect those weapons not typically possessed by law-abiding citizens. It applies to law-abiding citizens for lawful purposes. That's Heller. That's the historical. Unless you're telling me that's over, that Bruin got rid of it. I'm not telling you that Bruin got rid of it. What I'm saying is that's, what Heller said is that's the historical tradition. So as a matter of plain text, yes, even those arms are presumptively protected. It was a limitation in Heller on the right to keep and bear arms. That's what it was. Yes, it's the historical tradition. And it regarded the sorts of weapons that could be protected. Yes, and that's from Part 3 of Heller which says, okay, we put together the textual elements. They protect the right to keep and carry weapons in case of confrontation. That's what the plain text. I'm just making an agreement here. It's not any weapon. There is a limitation on it. But from Heller, it cannot be any weapon when you start off with plain text. You first have to determine that law-abiding citizens for lawful purposes under Heller. That's correct, isn't it? No, Heller said prima facie, as a matter of plain text, every weapon is protected. Okay, let me read it again. Every bearable, every bearable, bearable. Heller says this language here. The Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes. You are telling me that means nothing. I'm telling you that that's not just talking about plain text. At the plain text, it's only presumptive protection. The Second Amendment does not protect those weapons because of history, the historical limitation on the scope of the right. So that's no longer true. Yes, it's true. It is a historical limitation on the scope of the right. That's what ultimately is protected. I'm sorry. Now I'm confused because I thought you said to Judge Qualabong not if they are, not if they become commonly used. So at the textual step of Heller, all weapons are protected, presumptively. It's the prima facie, presumptive bear text. And you can't distinguish one weapon from another at the plain text. But as a matter of historical limitations, weapons that are dangerous and unusual can be banned. But weapons that are in common use necessarily. Okay. But I thought Heller was clear you can ban an M16. And they didn't say until it becomes commonly used. So I thought that had to be going to kind of the initial scope of the right. Because there was no suggestion in Heller. I thought that if the actual machine guns become commonly used, they will suddenly get second amendment protection. But you disagree. I disagree because if you No, Bruin emphasizes two or three times. It uses the word all instruments that constitute bearable arms. That's what's a prima facie. That doesn't mean it's protected or right. It's prima facie. You get into court and the burden then shifts to say all instruments, all bearable arms constitute bearable arms. Now it's up to the burden shifts to show the limitations. The court was clear to point out that the prima facie was limited. Correct. But it shifted the burden on the limitation to the state. Exactly right, Your Honor. To me it's just it's in black and white. And if we don't like Bruin, we shouldn't be on the court. We don't have to like what the Supreme Court does. We have to follow it. But Bruin didn't change Heller. Correct. But Bruin clarified Heller. Justice Alito wrote a separate concurring opinion that said it doesn't change Heller a bit. And Heller resolved the issue as to M-16s and the like. You're right. And in that paragraph, in that paragraph, in that paragraph it said. M-16s and the like. In that paragraph it said what the distinguishing factor of those firearms were. And it said they're highly unusual in society at large. All right. Thank you. Yes. Thank you. Mr. Scott. Thank you, Your Honor. I'll leave the court. I'll ask you preliminarily. I don't understand what the district court would be expected to do necessarily on a remand. I worry that a remand would drive the district court crazy. Is the district court supposed to go weapon by weapon through the different things that are listed in the assault ban? And say, well, this one is in common use and this weapon is not in common use. And so I'm afraid that a remand would tie us up for an indefinite period of time when there is a, I think, a sense of, if not urgency, expedition in getting this matter resolved. So am I correct in thinking that your preferred position would be to affirm? That's correct, Your Honor. We believe that. That's what I thought. So let's follow up on that for just a second. That you would, that affirm avoids the briar patch that awaits the district court on remand. It would be a hard thing to extricate ourselves from. We'd have another appeal and on and on and on and on. So the Supreme Court, and I think that I find a good bit of agreement with Judge Wynn's view in terms of the common use as a preliminary question. But at the same time, the Supreme Court has given the Court of Appeals some latitude in terms of the sequencing of proof. And so you saw that in a case like Pearson v. Callahan and all the rest. So I'm not sure that the Supreme Court in Bruin straightjacketed us into marching through this step and this step and this step. I think it gives you some latitude. As Judge Diaz pointed out in the Seventh Circuit case, and I think I looked at it briefly, it's at least possible to say, oh, you can assume the arguendo that, even assuming arguendo, that these weapons are in common use. They are still the subject of permissible limitation because of the historical practice of firearms regulation. Would that be fair? Yes, Your Honor, I agree with that. And the historical practice of firearms regulation has been, whenever new technologies have arrived on the scene, the states have not been defenseless in the face of technological advances. And if you hold the states powerless as technology devises more and more lethal models to these weapons, we are putting our society at gradually increased increments of risk. Yes, Your Honor, I agree with that. And so I see the advantage here that it can be resolved by looking over the whole history of firearms regulation in this country. And the almost invariable lesson has been that if there are leaps in lethality of weaponry, the state is not obliged to just sit back and accept so kindly what the increasing dangers brought about by firearms innovations pose. As I am trying to encapsulate your argument, it seems to me that was what you were going for, not necessarily to tie us up in the infinite exercise of a remand, but to affirm this, and then let, if there's a particular weapon in the future that shouldn't be in that list, then you go in where you raise an as-applied challenge to it. But to write at the outset, enjoin this whole statute in its entirety, which is what your worthy adversaries are seeking, is going to be an extraordinary step to enjoin this whole thing. Yes, Your Honor, particularly in light of the fact that this court already has. I hope I'm catching the thrust of your argument. That's correct, Your Honor. And I think it's particularly important to point that out in light of the fact that. Well, can I explore that a little bit with you? I'm here. Yes, sir. On a remand, if I understand Bruin, we have to, we start with the plaintiff's challenge based on a prima facie right. And the prima facie right relates to all instruments involving bearable arms, arms that can be carried. And then the state has to come and demonstrate, as applicable here, whether the arms being regulated are dangerous and in common use. One of the arms, the most prominent arm being regulated here is the AR-15. And my question to you is, has the district court made a determination as to whether AR-15s are today in common use? No, Your Honor, the district court didn't reach that issue. I understand that. So the question is, either we make that determination, which we're not well suited to do, or we have the district court. It has to be done under the Bruin analysis to justify the regulation. And as a consequence, it seems to me, regardless of whether it's troubling for the district court or a briar patch or troubling for us or a briar patch, that's our task. And either we do it or the district court does it. And it seems to me what suggests the remand is that the district court is better suited in its role of taking evidence and hearing argument and exploring this and answering the critical question that it must under Bruin, whether AR-15s, for instance, are in common use. Except, Your Honor, that this court already held in Colby, and it's the state's position that the primary holding in Colby is still valid law and was not overturned by Bruin. We're here today to determine that. We're not bound by our former decisions. We're not bound by our former panel decisions. We are confronted with applying Bruin to this case. And even though Bruin said it didn't change Heller, Heller is certainly the foundational opinion. But if Bruin says something more clearly about Heller, we have to apply Bruin. That's our task. And you agree that after you get by the prima facie, plain text consideration, then the burden shifts to the state to show that in the present tense, that's what Bruin says, whether it's dangerous or in common use. And it seems to me that may be debatable. I don't know. But I do know that everybody seems to agree that there are 24.6 million AR-15s in circulation now. And the question would be whether that is common use. And as you know, the Central District of California said, no, that's not common use. And they did a bunch of calculations and came to that conclusion. Whether they're right or wrong may be something that the Supreme Court's going to have to answer. But at this point, no one's made that determination. And it seems to me that the prudent thing for an appellate court is to send it back to the district court. Now, what's wrong with that? Well, I think this court's already. I'm not suggesting by any means that this court couldn't change its mind. Have we determined that the AR-15 is not in common use or is in common use? I think Colby held that the AR-15 and the other weapons banned by this law are, in fact, the equivalent of the. I understand that, Holden. But that is not what I'm asking you. I'm asking you, did we or any other court with respect to this statute determine whether AR-15s are in common use? That analysis does not appear as with respect to how it's articulated. And that's what Bruin demands, right? No, I don't believe so. Not unless you get to the second step. Well, the first step is very broad. I've read you the first step and they made it clear and they repeated it. The Second Amendment extends prima facie, that means just the starting point, to all instruments that constitute bearable arms. Now, it seems to me it's not hard to conclude that an AR-15 is a bearable instrument. Right, but then they go, but if you look at Heller, Your Honor. No, this is Bruin. I understand. And Bruin is stating the principle, it's clarifying. It didn't follow Heller 100%, you know. Well, that's it. That's the conundrum we're in. What Justice Myers pointed out is where the difference lies. If you read Bruin, a case that's dealing with handguns in New York City, and then you think that it took care of everything in Millard and dealt with sawed-off shotguns and Heller, then yeah, you'll get there. You will skip right over that first step and go into the historical aspect of it. But Millard made it clear. Millard tried to save it. It said the militia, and then it went into the historical aspect of it. But ultimately, Heller clarified Millard and said, well, we're not talking about a militia here because if we do, machine guns are going to be in there. That regulation is out of the window. But it did go on to say that the type of weapon issue is what is at the point of the Second Amendment protection. And so for that proposition, we look to the Second Amendment because it does not extend to all weapons. It extends to only certain types of weapons. Now, if you pull from Bruin, from a handgun case, that now every weapon, including machine guns and shotguns are now off the record, even though we've already said those all, you're going to get there. You're going to get exactly where Judge Niemeyer is. You're going to slap, and that's going to make it harder and harder. But as Judge Wilkerson has alluded to, it's going to make it harder and harder for the states, for governments, for the people to enact rights to protect themselves because you've got to skip over that first. You've got to accept a grenade and all kinds of – and I won't use that. That's too much of a mass weapon. But machine guns and everything, and then you get into this esoteric analysis on the historical aspect. But it's in step one. And if you get it in step one, which I believe is done here, then you're there. And that's the reason that Coby is still good law. It may not be binding because an unbound court can always rule against an unbound court, but this court made the pronunciation, and the only part of it that's abrogated by Bruin is the means in test, not the rest of it. It looks all good to me, what we said in Coby, and it seems like that question is answered here today. We can keep sending it down, as Judge Wilkerson says, and do what Judge Hickau wants us to do, go through every one of these and keep going back and forth on it, but the plain text of it covers this answer at step one. We don't need to go to step two. Yes, Your Honor, I agree. And, you know, the Coby decision is based on a very robust factual record. There's an extensive record in that case which the court analyzed in its opinion. Bruin was a handgun case. In New York City, telling people you can't have a gun, you've got to show you have some good purpose of doing it. And the court said, no, that's not it. Miller is a shotgun case. We've got machine gun cases. I mean, all kinds of cases are coming up, but Bruin, to pull from that language that it then wipes clean all of the cases that dealt with certain types of weapons, I don't think that's the case at all. Well, in fact, Justice Alito... Can I ask you a procedural question about this common use for a lawful purpose? If that is a preliminary question, and then you move to the historical analysis, what's your position, what happens, what is the court looking for at the second step, the historical analysis? If the court decides, yes, this has been common use for a lawful purpose, therefore we move on to step two, what do you think happens at step two? Well, I think Bruin requires that there be some sort of a historical analog. But what is the court, what is the government trying to prove at step two then? Justice Quaddabond pointed out that in Heller it seems that common use for a lawful purpose ended the inquiry. When the court concluded handguns are a common use for the lawful purpose of protecting your home, that's all we need to know. Therefore, the state cannot ban them. But you're saying there's another, the state can still rescue its regulation by proving what? By proving that the law is consistent with the historical tradition of firearm regulation in the United States. And what would that be? Would that be a historical tradition of banning weapons that are in common use for a lawful purpose? Well, in that case, I think it would be it's regulating and or banning dangerous weapons that are extraordinarily dangerous. Yeah, that can't be. Doesn't Heller tell us that guns that are, or weapons that are in common use for lawful purposes, by definition, are not unusual and dangerous weapons? Well, so it seems, it comes from that tradition. That's what Heller says. And it seems to me whether or not, to follow up on Judge Rushing's point, whether or not it's at point one or point two, if there's a finding that the weapons are in common use for lawful purposes, and I know that may be disputed, but assuming it is, you would have to have a historical analog for something other than the regulation of dangerous or unusual weapons. Do you have one besides that? Well, Your Honor, I think... Can you answer, I mean, I know you, could you just answer me if you have an analog other than regulation of unusual and dangerous weapons? My analysis may be wrong, but as soon as I'm right, is there another, why, is there another analog that you would point to? The analogs that we pointed to in our briefing include laws that ban, for example, trap guns, which were considered to be dangerous and unusually dangerous. And so that's the historical analog. The plaintiff's position is if the gun is popular, it cannot be banned. It can't be banned at all, regardless of how dangerous it is. And that's not consistent with Heller. Heller explicitly says M-16 and military-type weapons, either they're not, and it really doesn't matter, either they're not covered by the textual definition or, and therefore excluded from Second Amendment protection, which is our position, or they are consistent with a historic tradition of regulating and or banning dangerous weapons. I got it that you think Colby remains, you know, tenable law, and that's something we have to decide. But I think I heard you say that at the end of the day, all your historical analogs are the regulation of dangerous and unusual weapons. Is that correct? Dangerous or unusual. Okay, well, I'm not, yeah, that's an issue, too. Whatever, however we resolve that, and if you assume that common use for lawful purposes is a determination, it's a fact, though, that it's not dangerous or unusual, then there's no other analog you can point to. Well, there's no other why. There's no other historical analog on the why axis that you can point to. Well, would you, yeah, I mean, I think what the courts have done when you look at the analogs is that you look at both the how and the why. I'm asking for why. Is there another why besides regulation of dangerous and unusual weapons? Is there another why? Another analog that goes to a different why. An analog that bans a weapon not because it's dangerous but for some other reason. Correct. Your Honor, I can't point to one. Okay. But I don't think, obviously, we don't agree that that's the dispositive question here. Yeah. I mean, the question, I mean, the courts have been pretty clear that if, for example, machine guns. I mean, what's the historical analog for banning machine guns or bazookas or shoulder-fired nuclear missiles? Are we going to say, well, if you can't point to a historical analog that that type of weapon, if there's another reason other than the fact that it's extraordinarily dangerous, then you can't regulate it. I think that question presumes that there's been a determination that those weapons are commonly used for lawful purposes. Well, again, I think Bruin made clear that the test is in common use for self-defense. And I think that's the test that controls here, not whether it's for common use for lawful purposes. One thing that concerns me here is that my friend, Judge Niemeyer, in wanting to remand this case, is drawing the judiciary further and further into the position of, did we become the draftsman of a substantive code of firearm regulation? And I'm just not sure that the judiciary by and large is a bit process-focused. And I'm just not sure that going weapon by weapon and saying, yes, this is regulatable, this is not, whether we have completely taken over a legislative function and are being asked essentially to draft a code of firearms regulation. And the other thing, it seems to me what you're asking, as opposed to what your opponents are asking, is you're not asking for, you're just asking for one state to be allowed to go its own way in ensuring the safety of its citizens. You're not asking for Montana to impose an assault weapons ban. You're not asking for Maryland values to be transported to Montana. But by the same token, Montana values and Montana's challenges shouldn't be imposed and imported into the state of Maryland. I mean, the way our federal system is supposed to work is that each state should be, within reason, able to determine what's best for its own citizens. That's at the heart of the state's police power. Since time immemorial, we talk about the state's ability to ensure the safety and welfare and well-being of its own citizens. And to then say that a state is handcuffed and powerless to respond to these technological innovations, that's an extraordinary step. And that is what they're asking. And as I understand it, and America's briefs lay this clear and your brief lays this clear, the historical record here, whether you go back to brass knuckles or whether you go back to bully knives or whatever, whenever there's a new danger presented, states have been given some latitude in responding to that. And to sort of go to this counter-historical theory is really quite dramatic. You see what I'm saying? Yes, Your Honor, I do. Again, when Bruin talks about when you do look at the historical tradition, Bruin makes clear you have to consider technological changes and dramatic societal concerns. And that's exactly what this is. My good friend Judge Wilkinson talks about power of states. This whole thing really started in terms of dealing with cities that knew what violence was with handguns and death and tried to regulate it. So, it doesn't even start from a premise of trying to states having power on cities to protect themselves from known violence. It's really, it's just saying how broad the Second Amendment is. And it's broad because there's no right to an education in Rodriguez-San Antonio School District. There's a right to bear arms. Whether you like that or not, that's what we're dealing with. So, that's not the question. Every firearm is dangerous. That's not even a problem. Your Honor, but some are more dangerous than others. And the problem is when the court names an M16 and carves it out, that's fine. But the test they give us doesn't give us good reason to take that weapon like AR-15 out as well. I mean, for example, the purpose is to, for you to defend yourself, right? That's the core right. So, self-defense is not based on the type of weapon, is it? It's based on my defense to me. But, Your Honor, these weapons are not particularly well-suited for self-defense. They're not? If someone, if five or six people broke into your home and you tell them they're an AR-15, they wouldn't help you out? The question is are they well-suited for self-defense. Are they well-suited? You can't, it's one thing to carry a handgun around as self-defense if you feel like you're a paramedic and you're going into a dangerous neighborhood. I'm talking about my home now. That's the most precious place. You mean to tell me if five people were breaking into my home, an AR-15 would not be very helpful for self-defense? Well, an AR-15, if it's properly stored, is going to be in a safe. If it's properly stored. Well, a handgun, if it's properly stored. A handgun, I think, would be much quicker. You'd be able to store it in a place where you could get to it much quicker if you had people. You know, those arguments have nothing to do with the Second Amendment. You know, we're talking about a constitutional right that's defined by the right to keep and bear terrible arms. And the court said that in the abstract that is without limit. And the limits are imposed, are recognized as part of the right, but the burden of showing the limits is on the state. And despite what you said, the court has said again and again it has to be dangerous and unusual. And they quote that again and again. And that's your burden to show that it's both dangerous and unusual through some historical analog. And so your argument that you don't have to reach that because Colby held that it's not an instrument of self-defense doesn't follow the Bruin text. And I don't know why we want to diverge or second-guess the court so blatantly. It seems to me that the standard is our exploration here ought to be what Bruin said and held. And it was just as clear as a bell in my judgment that it had a two-part test defining the right with limitations. But the two-part test started with an unlimited presumption whether it was a bearable arm. And then said the state can regulate that if it's dangerous and unusual. Now, there may be other analogs, but I think Judge Quattlebaum asked you and you probably fairly recognized that. That's the only analog that would be applicable for the regulation that's before us. Your Honor, the suitability of these weapons for self-defense is relevant here because weapons which are not in common use for self-defense are not protected by that. You're just missing the whole point. The whole point was any instrument that's a bearable arm is presumptively protected. Presumptively. And then it comes on your burden to show that it's not suited or whatever you want to argue. But my point is we're just ignoring the Second Amendment. And the court three or four times explained the text. And at one point even said it's unlimited, the text. And you keep wanting to put in limitations. And the text simply says the right to keep and bear arms shall not be infringed. Well, the Supreme Court has made clear that weapons that are not in common use for self-defense are not covered. They did not say that. They said that as part of the historical analysis. That's the limitation. But they did not say that in the first step. They said just the opposite. They said just the opposite. They talked about it. They said the first step does not have limitations built in, but the state has the burden of showing them. And it recognizes that they're valid. So if the state comes in and says it's dangerous, it's ill suited, it's not in common use, you don't have to store a handgun, you store an AR-15, if that's legitimate, you can make all those arguments. But it seems to me you start off with a proposition that with a plain text. And what you're trying to do is to load up the plain text with in common use. And it doesn't say that. But even if it's in common use, they pointed out it's over 20 million AR-15s. And now it seems to me you might have to argue that that's not plain use. And maybe you can make that argument. My whole point, though, is that if we're going to follow the instructions given to us by Bruin, it seems to me that what we would prudently do is say the plain text entitles the plaintiffs to get into court. And then you have to demonstrate one of the limitations which you have a right to do and which exists. The court recognizes they exist. But it burdens on you. And you conceded that you have not yet addressed, the court didn't address, whether AR-15s are dangerous and in common use. Yes. That issue would be a distinction of where we are, what Judge Niemeyer has alluded to. In my view, he is simply saying step one is superfluous. Anything you bring in is okay. Then you go to step two. That's not my view. That's not the view I think Bruin brings. So even though we can state it as he does, as though Bruin absolutely says this, that is the differentiation of the point of view that we have now. Do we go to step one? Does it mean anything more than just show us what you got and all of a sudden we go to step two? Or do we do like Bruin and look at the three different means by which one can say that's not one of the weapons that fits on the plain view because it's not in common use? If you don't have the people aspect of it, the citizen, it's not satisfied for the course of conduct aspect of it. But if you take Judge Niemeyer's point of view, that's a question that you can answer, but you should answer it with the condition that's his interpretation of Bruin, which is a good interpretation, but there's a different interpretation of Bruin, and that's the decision we have to make today. Yes, Your Honor. I see my time is up. I have a question. Yes, Your Honor. If you don't mind. So I think the questions today illustrate that you could take parts of Bruin and parts of Heller and write an opinion either way, and I suspect there will be. But to go back to the plain text standard that Bruin articulated, here I take it there's no question. The state does not contend that the plaintiffs here are not part of the people. Not based on the allegations in the complaint, which is all we have to go on. So both Heller and Bruin spend a lot of time talking about law-abiding, responsible citizens. So where does that come into play in this step one, step two dialogue? It's the state's position, Your Honor, that the text as to whether the plaintiffs are included in the people and whether the conduct and or the weapon at issue are within the definition of arms takes place at the first step of the analysis. And that's how Bruin did it. If you read the opinion, those are the first two issues. It may not be applicable in your case, but that doesn't really answer where does a court address this constant refrain of law-abiding, responsible citizens? So in your view, that's part of the plain text analysis? It's part of the analysis as to whether or not the plaintiffs are within the definition of people in the Second Amendment. Thank you, Scott. Thank you. The business of law-abiding citizens in Bruin was a non-issue. These were law-abiding, upright citizens in New York. They simply wanted a handgun. We're not talking about that as an issue. So I don't know how it was discussed, but they sort of glossed over it. And they glossed over the common use because handgun is in common use. So when you get beyond that and all of that was within the step one, then they turn to the historical aspect. But they didn't get to it because they got it. They went to the second part to get to it because they didn't make the determination for the step one. Then went to the second step. Thank you. Thank you very much, Mr. Scott. Mr. Patterson. Thank you, Your Honor. Just a few points. I'd like to start out on this plain text point. I think a First Amendment analogy could be helpful. If I'm talking about obscenity or fighting words or defamation or something of that nature, that's all speech. That's within the plain text of the First Amendment. But it's within a historical exception that those items aren't protected. It's the same thing here. Heller says all firearms, all bearable arms are arms. So all those things come within the plain text. But if you do agree that Judge Agee alluded to the words right of the people, it's plain text. You do have to determine what it would mean by the people. That's certainly not something you just gloss over. You don't gloss over it. But what Heller said is similarly, like the First Amendment, all speech is speech. All Americans are people. That's all the plain text analogy. I don't think that's right. If you go back to Heller, the people was defined by its context in the Constitution. And the Constitution used people what's eight or nine times. Correct. And the Supreme Court concluded that that referred to citizens in the United States, adult citizens who had rights. We the people. And you went to the preamble. So people was a constitutionally understood term. It was not something that they were just making up out of the dictionary. Well, that's why I said all. They were part of the political community. That's why I said all Americans. They used political community, national community, and Americans as citizens. My only point is that it was not a dictionary definition of people, which constitutes all the people. It was a constitutionally understood term that was included in the Second Amendment. Well, and it's consistent with the dictionaries because if you look at Webster and Johnson. No, it's not because women didn't have the right to vote and slaves didn't have the right to vote. I mean, it didn't include all the people included these. It included the adult citizens at that point. I actually disagree, Your Honor. I think the people that it said were all people, all members of the national community. Many of the people come together. Did that mean women came together and conveyed rights from the states to the federal government? Women were part of the people at the founding. I agree with you that many did not consider slaves part of the people at the founding. Right. So the question today would be who are the people today? That would be the question of what we would look at. People meant in the Second Amendment. Right. What did the Congress mean? What did the Constitution mean when it used the right of the people to bear arms? Yes. And it seems to me my only suggestion to you was that that was addressed at length in Heller. And it was not addressed as a definition of all the people, human beings. It was addressed as what people meant in the Constitution. Not all human beings, as Webster and Johnson said. It means the polity, the people who make up a nation. That's who the people are. Reading your briefs and everything, you almost assume a categorical status for Heller and Bruin. And as I read those two opinions, there's an element of caution that runs through them, whether it be in a footnote or wherever. But the court in both cases is careful to underscore the limitations and what the decisions don't apply to. Judge King earlier mentioned the exception of the explicit of M-16. But those cautionary notes had to be very carefully negotiated within the court. And they set forth important limitations. And so I think what we're trying to do is to take that language from the Supreme Court and the language of limitation, which is there in both opinions, and see if it applies here. And the case for having it apply is twofold, it seems to me. Number one, we're talking about weapons that represent a gigantic leap over what was done before in Heller and Bruin. That's one point. And then another point is that the historical flow is really, and Bruin's emphasis on the history, is really quite dramatic here. Because you can go back centuries and find that as new dangers and new firearms presented themselves, states responded by different forms of regulation. And to begin at this late date to restrict the ability of states to respond at a time when technology is advancing at a more rapid pace, not a less rapid pace, than at the time of the founding, it seems would turn the historical values on its head. And it's important to look not only at what Heller and Bruin said, but in what they refrained from saying. And they refrained from enunciating any principle that would handcuff the states as new advances in weapon lethality appeared on the horizon. And that is the unprecedented step that I feel like we're on the verge of taking. I think that the Second Amendment challenges in many instances have overread what Bruin and Heller actually said and the limitations explicit that those two opinions impose. I see that my time is up. May I respond? Absolutely. Okay. So, Your Honor, a few points there. Heller and Bruin did leave a lot open, but one thing they did not leave open is that arms in common use are absolutely protected. And that it is a feature of the Second Amendment that protection keeps up with technological developments. And it would not make sense, again, the purpose the right was put in the Constitution was to protect the militia. And again, what Heller said basically is you can look at that purpose as a sanity check. And it would not make any sense to the founders of this nation to say, okay, as firearms technology develops, we're going to deprive our militia of that. That would not make any sense. And there is zero history in this country, they have not pointed to it, of banning new firearms technology. There is zero outside of machine guns. And the issue with machine guns, again, is indiscriminate fire, collateral damage, you can't aim it. And these are the opposite. These are accuracy enhancing features and there's no history of banning firearms because they're accurate. If you feel that a firearm is wrongly included in this piece of Maryland legislation, why don't you bring an as-applied challenge to that? As I indicated earlier, what troubles me is that this is a spatial challenge, this is a sweeping challenge, this is to wipe the efforts of the Maryland legislature in total. Off the table. And it seems to me that this is an analog to the spatial challenges that arise under the First Amendment and that those spatial challenges are met with disfavor. And yet we're seeing it again. What you are asking in your request for equitable and injunctive relief is something quite dramatic, which is to take a whole category of weapons and place them beyond the reach of any kind of state legislation, no matter how reasonable or well-founded. Your Honor, we've limited our challenge to semi-automatic rifles. There's a list of them, yes, but they're all the same type of firearms. And if those firearms are protected, they can't be banned. We're not saying they can't be regulated, but they cannot be banned. You don't know that. There may be significant differences between them. Who knows? And it would be the state's burden to show that, that any particular one was dangerous and unusual. But these are all of the same. Again, it would be the same as if in Heller, D.C. had listed every make and model of handguns. I submit that would not have made a difference to the outcome of that case. Mr. Patterson, if we were to agree with you, and I think earlier remanded that, how do the district courts determine what's common use? Two points, Your Honor. First, if there were to be a remand in this case, I would urge the court to direct the district court first to focus on common use. Because what we've seen in a lot of cases is that states come forward with basically the same evidence they came forward with before Bruin and about, you know, the dangers and misuse and bring forward 10 expert reports. And none of that is relevant. I'm just curious as to how that would look. How would a district court determine what common use is? Well, we would look at the evidence available, and we basically put forward three buckets of evidence to this court. One is user surveys from the Washington Post, Professor William English, and the NSSF. The Washington Post, for example, showed that 16 million Americans own these. Ninety-one percent said self-defense was a reason that they own them, just for example. So that's one bucket. We also have production data. The latest production data shows that there are over 28 million of these firearms in the nation. And we also have firearms retailers' data. And that data shows that for the past decade, these have been approximately 20 percent of all firearms sales in this nation behind only semi-automatic pistols, handguns. So 20 percent, you think 20 percent is common? Well, it's the second most common in the nation. So unless only semi-automatic handguns are protected, yes, that would be common. So whatever is, I think you used the word popular earlier. Yes, whatever is not highly unusual in society at large. And, for example, I was, you know, looking something up last night, actually. There are 2.5 million approximately estimated electric vehicles in this nation that are registered to drive on the road. I don't think people would say those are highly unusual in society at large. Those are common vehicles. And yet there are 2.5 million. So popular and common is the same thing. If law-abiding citizens possess it, what Heller says is what's not protected is what's not typically possessed by law-abiding citizens for lawful purposes. So if it's something that's common, if it's something that is not highly unusual, then yes, it's protected. Mr. Patterson, so you indicated, you just described what the test should be for common use. But the state still can come back and present evidence, if it can, that notwithstanding its common use, even for the core reason of self-defense, that the particular weapon at issue is either unusual and dangerous, right? Do you agree with that? I do not agree with that. If something is common use, it is by definition both not unusual, but it's also not dangerous. Because it has to be dangerous compared to what? And it would be dangerous compared to what is common. And if something is in common use, it can't be unusually dangerous. So to give the example of your machine gun example, which we alluded to earlier, if for some reason that had become unregulated, you told us earlier that the problem with that handgun, that weapon, is that it's not easily managed and can cause indiscriminate firing. But under your view, that wouldn't matter. A state couldn't legislate that if it were in common use for lawful purposes. It's in common use for lawful purposes. It's a conjunctive test. The state has to show dangerous and unusual. And if it's in common use, it can't be unusual. And again, it also can't be unusually dangerous. Let me, the last thing I'll ask you, and of course my colleagues may have other questions, you pointed to media stories about the commonality of these weapons and that may be in fact true. But what about, would the state be able to look to the media stories of its increasing use in mass shootings? No, and actually, once it's in common use, if we look at the dissenters in Heller and Bruin, and there was an amicus brief in Heller, Bond's Policy Center, that was basically the exact same arguments the states are making, states making, except with respect to handguns. Same thing in Justice Breyer's dissent in Bruin, went through mass shootings, urbanization, increased lethality of firearms. The majority didn't talk about any of that in either of the cases. How can the use in mass shootings be for a lawful purpose? That's not for a lawful purpose, but that is a very rare use of these firearms. First of all, handguns are the weapons of choice in mass shootings. That's what the state's own information shows. Handguns, actually, the use of these firearms in mass shootings are not associated with increased lethality. The use of handguns is. That's what the Blau study found. That's in the COFRS report that the state cited. But in any event, if we look at all rifles in this nation, there are approximately 350 people are murdered with rifles a year in the nation. Of course, every one of those is a horrible event. We don't support it, of course. But if we were to say every single one of those rifles was one of the banned rifles and was a different one of the banned rifles, that would mean that 99.9 percent over of these rifles are not used for that purpose. And it pales in comparison of the handguns, which is over 6,500 murders a year in handguns. So, as Justice Kavanaugh said, if we were going to use the language of assault weapons, it really would be handguns because that is what is the preferred firearm for both regular criminals and mass shooters. And if that could not support a ban of handguns in Heller, the lesser use of these firearms for those purposes can't support a ban in this case. All right. Thanks very much, Mr. Patterson. We're going to come down and greet counsel and thank you both for your able arguments and then take a brief recess before we move on to our second case. This honorable court will take a brief recess.
judges: Diaz, Wilkinson, Niemeyer, King, Gregory, Agee, Wynn, Thacker, Harris, Richardson, Quattlebaum, Rushing, Heytens, Benjamin, Berner